**MKPARU, Appellee and Cross–Appellant,**

**v.**

**OHIO HEART CARE, INC. et al., Appellants and Cross–Appellees.**

[Cite as *Mkparu v. Ohio Heart Care, Inc.* (1999), 138 Ohio App.3d 7.]

Court of Appeals of Ohio,
Fifth District, Stark County.

No. 1998CA00283.

Decided Nov. 8, 1999.

*Thomas W. Connors,* for appellee and cross–appellant.

*Allen Shulman, Edward Kancler* and *Rebecca S. Rupert,* for appellants and cross–appellees.

HOFFMAN, Judge.

Defendant-appellant and cross-appellee Ohio Heart Care, Inc. (hereinafter "OHC" or appellant) appeals four judgment entries of the Stark County Court of Common Pleas: the August 28, 1998 judgment entry which memorialized a jury verdict against OHC on a claim for fraudulent misrepresentation; the August 28, 1998 judgment entry which memorialized a jury verdict against OHC on its claim for breach of contract; the September 29, 1998 judgment entry which extinguished a preliminary injunction in favor of OHC; and an October 2, 1998 judgment entry which denied appellant's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. Plaintiff-appellee and cross-appellant is Fidelis O. Mkparu, M.D. (hereinafter "Dr. Mkparu" or appellee).

Dr. Mkparu cross-appeals that part of the September 29, 1998 judgment entry which memorialized a directed verdict in favor of defendant cross-appellee David Utlak, M.D. (hereinafter "Dr. Utlak"), on all claims, and in favor of OHC on the punitive damage claim.

## STATEMENT OF THE FACTS AND CASE

This appeal arises out of a contractual dispute between the parties and centers on two issues. OHC's appeal focuses on whether Dr. Mkparu breached the terms of his employment contract by making disparaging comments about OHC to

recruits. Dr. Mkparu's appeal focuses on whether OHC and Dr. Utlak fraudulently induced Dr. Mkparu to enter into an employment contract.

OHC conducted an employment interview with Dr. Mkparu. Jim Hanlon, then CEO of OHC, expressed interest in Dr. Mkparu due to his outstanding credentials and experience in heart failure and nuclear cardiology. At the interview, Hanlon explained OHC took great pride in its staff of world-renowned physicians and its new, technologically advanced facilities. Dr. Mkparu was particularly interested in working with two prestigious physicians, Drs. Ahmed Sabe and James Maloney.

At the second interview, Hanlon stated Dr. Mkparu, if offered partnership, would be an equal partner. After meeting with Hanlon, Dr. Mkparu met with Dr. Utlak, who, along with Dr. Carlos Fabre, founded OHC. Dr. Utlak gave Dr. Mkparu a history of the corporation and stressed the benefits of partnership in the group. Dr. Utlak also explained that at the end of a two year period, it would be possible for a physician to purchase shares of the corporation, making that doctor an equal partner in the group.

After the second interview, Hanlon offered Dr. Mkparu a position with OHC. In that conversation, Hanlon went over the contract and reconfirmed Dr. Mkparu could become an equal partner after a period of time. He told Dr. Mkparu he would send the written contract in the mail.

Dr. Mkparu received a letter agreement dated October 17, 1995, and signed by Dr. Utlak. The letter agreement contained the following paragraph:

"This means that, for example, if you were to become the fourth shareholder of the Corporation, you would have 25% of the equity ownership of the Corporation. Clearly, therefore, your purchase of equity in the Corporation has significant value."

Dr. Mkparu testified he was pleased with this arrangement. In fact, he was looking for just such an ownership agreement. Dr. Mkparu testified he would not have accepted the contract if there was no provision for equal ownership. .

The letter agreement also stated the operation of the corporation was governed by a closed corporation agreement. Dr. Mkparu testified he understood the contract to be a summary of the closed corporation agreement. He further testified the verbal representations, together with the summary contained in the letter agreement led him to believe he would be afforded the opportunity to purchase shares making him an equal partner.

At trial, Dr. Utlak testified the general employment contract for each of the doctors and OHC was essentially the same. It was his intention to persuade incoming doctors to accept employment with OHC. Dr. Utlak explained the closed corporation agreement provided a shareholder/physician would be paid a

salary, receive a percentage of his or her productivity as incentive pay, participate in profits and the bonus pool as determined within the sole discretion of the executive board. The executive board consisted of Dr. Utlak and Dr. Fabre. Dr. Utlak testified he never promised Dr. Mkparu equal ownership in OHC. In fact, Dr. Utlak stated he never recalled the topic being discussed.

Dr. Mkparu accepted a position with OHC on March 4, 1996, and immediately developed a heart failure program for the group. Dr. Mkparu first saw the closed corporation agreement in early 1997. The provisions for equal ownership were very different than Dr. Mkparu's original understanding. The agreement specified Dr. Utlak and Dr. Fabre would each maintain one hundred fifty shares of the corporation. Each new shareholder/physician would be permitted to purchase ten common shares of the corporation stock. Dr. Mkparu immediately sought an explanation for the contradiction. Dr. Utlak and Dr. Fabre each agreed there were some mistakes and assured Dr. Mkparu the mistakes would be corrected.

Additionally, Dr. Utlak held a physicians meeting, assuring all of the physicians the mistakes in the closed corporation agreement would be corrected.

Dr. Utlak made an offer of partnership to Dr. Sabe, a prominent physician who had been with OHC over two years. However, in August 1996, shortly before the offer, OHC transferred its assets, along with a corresponding debt, to a newly created limited liability company, United Health Network, Limited (hereinafter "UHN"). Jeffrey Russell, previous Chief Financial Officer of OHC and President of UHN, assisted in the transfer of $500,000 in assets, including OHC's employees and medical equipment. At the same time, OHC entered into an agreement with UHN in which OHC agreed to pay UHN a fee for management services. The only members of this newly formed company were Dr. Utlak and Dr. Fabre. The partnership offer made to Dr. Sabe did not provide for an interest in UHN.

A number of physicians, including Dr. Maloney and Dr. Sabe, left the practice. In an effort to fill the openings, OHC instituted an active recruitment effort. Unfortunately, OHC found itself unable to fill the open positions as quickly as they had hoped.

For example, a promising recruit, Dr. George T. Nahhas, turned down OHC's offer and accepted a position with a group in Michigan. Although he testified he turned down OHC's offer of employment based on its location, Dr. Nahhas also stated part of his decision was based on a conversation he had with Dr. Mkparu.

Dr. Utlak and Dr. Fabre hired a private investigation firm to systematically call OHC's physicians to identify the culprit undermining the recruitment effort. On or about December 11, 1997, Dr. Mkparu received a phone call from a Dr. Kaminskas, who explained OHC had contacted him about employment opportuni-

ties. He wanted to talk to a few of the physicians currently employed there to evaluate the work environment. In reality, Dr. Kaminskas was not a recruit at all. He was an old friend of Dr. Utlak who agreed to participate in the sting operation.

Dr. Kaminskas asked Dr. Mkparu to comment on his experiences at OHC. Dr. Mkparu indicated he was very biased and had nothing positive to relate. During this conversation, Dr. Mkparu made a number of disparaging comments about OHC, and about Dr. Utlak in particular.

Dr. Kaminskas reported back to Dr. Utlak. On December 18, 1997, Dr. Mkparu was terminated "for good cause." Dr. Utlak testified the termination was a result of Dr. Mkparu's conversations with Dr. Kaminskas and/or Dr. Nahhas. At trial, Dr. Utlak conceded Dr. Kaminskas was not an actual recruit, and therefore OHC did not lose a recruit as a result of the conversation. Because the termination was "for good cause," OHC told Dr. Mkparu it would enforce the restrictive covenant within the employment agreement which prohibited him from practicing medicine within 35 miles of OHC for three years.

On September 22, 1997, Dr. Mkparu filed a complaint against OHC alleging breach of contract and seeking preliminary and permanent injunctive relief from the restrictive covenant. On the same day, Dr. Mkparu filed a motion for a preliminary injunction. On January 2, 1998, OHC answered and filed a counter-claim for preliminary and permanent injunctive relief, seeking enforcement of the restrictive covenant. In a January 20, 1998 Judgment Entry, the trial court denied Dr. Mkparu's motion for preliminary injunction.

On February 4, 1998, OHC filed a motion for a temporary restraining order seeking enforcement of the non-compete clause. In a March 30, 1998 judgment entry, the trial court granted OHC's request for injunctive relief. On April 1, 1998, Dr. Mkparu filed a motion for reconsideration of the temporary restraining order.

On May 5, 1998, Dr. Mkparu filed an amended complaint which included claims for breach of contract, fraudulent inducement, punitive damages, and injunctive relief against OHC, and claims for fraudulent inducement and punitive damages against OHC and Dr. Utlak, individually.

The matter proceeded to trial on August 24, 1998. Just before trial, Dr. Mkparu withdrew the breach of contract claim. At the close of Dr. Mkparu's case-in chief, OHC and Dr. Utlak moved for a directed verdict on the injunctive relief issue. The court denied that request. OHC and Dr. Utlak also moved for a directed verdict on the fraudulent inducement and punitive damages claims. The trial court granted a directed verdict on both claims, but only as to Dr. Utlak individually.

At the close of all evidence, the trial court also dismissed Dr. Mkparu's claim for punitive damages against OHC. Accordingly, the jury was left with the fraudulent inducement claim against OHC, and OHC's claim for injunctive relief to enforce the restrictive covenant in the employment agreement.

The jury found in favor of Dr. Mkparu on both claims, awarding $99,500 in compensatory damages. In separate judgment entries, each dated August 28, 1998, the trial court awarded judgment in favor of Dr. Mkparu on OHC's claim for breach of contract and granted judgment in favor of Dr. Mkparu in the amount of $99,500 on his claim against OHC for fraudulent inducement. In a September 29, 1998 judgment entry, the trial court terminated the preliminary injunction against Dr. Mkparu. Finally, in an October 2, 1998 judgment entry, the trial court denied OHC's motion for judgment notwithstanding the verdict, or in the alternative, a motion for a new trial filed September 10, 1998. It is from those judgment entries appellant and cross-appellee prosecutes this appeal, assigning as error:

"I. The trial court erred by permitting appellee to introduce irrelevant evidence from three physicians formerly employed by appellee's former employer, appellant, which evidence served to confuse, mislead and substantially prejudice the jury against appellant.

"II. The trial court erred by permitting appellee to introduce irrelevant evidence regarding the departure of other physicians from appellee's former employer, appellant, which evidence served to confuse, mislead and substantially prejudice the jury against appellant.

"III. The trial court erred by permitting appellee to introduce irrelevant evidence regarding baseless claims of medicare and insurance billing fraud where appellee was not qualified to testify regarding such issues and such testimony served to confuse, mislead and substantially prejudice the jury against appellant."

Appellee and cross-appellant, Dr. Mkparu, cross-appeals the September 29, 1998 judgment entry in which the trial court memorialized its directed verdicts in favor of Dr. Utlak, and the dismissal of the punitive damage claim against OHC, assigning the following as error:

## CROSS–APPEAL

"I. The trial court erred in granting appellants' motion for directed verdict on the fraud claim against Dr. Utlak.

"II. The trial court erred in granting appellants' motion for directed verdict on the claim for punitive damages against appellants."

### I—OHC's APPEAL

In its first assignment of error, OHC maintains the trial court erred in allowing the testimony of Dr. James Maloney, Dr. Ahmed Sabe, and Dr. Steven Hirsh. OHC contends their testimony was irrelevant and served only to confuse, mislead, and substantially prejudice the jury. We disagree.

The admission or exclusion of relevant evidence rests within the sound discretion of the trial court and that court's ruling as to such matters will not be reversed absent an abuse of discretion. See *Krischbaum v. Dillon* (1991), 58 Ohio St.3d 58, 66, 567 N.E.2d 1291, 1298–1299; *Rigby v. Lake Cty.* (1991), 58 Ohio St.3d 269, 271, 569 N.E.2d 1056, 1058. In order to find an abuse of discretion, we must determine that the trial court's decision was unreasonable, arbitrary, or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 5 OBR 481, 450 N.E.2d 1140.

The test for relevance is set forth in Evid.R. 401:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable then it would be without the evidence."

However, the trial court may exclude relevant evidence under Evid.R. 403:

"Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury."

The testimony of each physician was presented in Dr. Mkparu's case-in-chief, before the directed verdict on the claims against Dr. Utlak or the dismissal of the punitive damage claim against OHC. Accordingly, claims for fraudulent inducement, actual malice, and termination for just cause were all before the jury.

The prima facie elements of fraudulent inducement are a representation material to the transaction; made falsely, with knowledge of its falsity, or with utter disregard and recklessness regarding its truth or falsity; with the intent to mislead another into reliance; justifiable reliance on the representation or concealment; and injury results proximately from such reliance. See *Burr v. Stark Cty. Bd. of Commrs.* (1986), 23 Ohio St.3d 69, 23 OBR 200, 491 N.E.2d 1101, paragraph two of the syllabus.

In a case alleging fraud, in order to be awarded punitive damages, a plaintiff must establish not only the elements of the tort itself but, in addition, must either show the fraud is aggravated by the existence of malice or ill will, or must demonstrate the wrongdoing is particularly gross or egregious. *Charles R. Combs, Trucking, Inc. v. Internatl. Harvester Co.* (1984), 12 Ohio St.3d 241, 12

OBR 322, 466 N.E.2d 883, paragraph three of the syllabus. In *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, the Ohio Supreme Court found actual malice to be present where a defendant possessed either (1) that state of mind under which a person's conduct is characterized by hatred, ill will, or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm. The latter category of actual malice includes "extremely reckless behavior revealing a conscious disregard for a great and obvious harm." *Id.* at 335, 512 N.E.2d at 1175.

OHC sought to bar the testimony of each of the doctors through a motion in limine. However, the trial court did not rule on the motion before trial and directed the parties to revisit the topic when objectionable issues became imminent during trial. The trial court, over objection, allowed each doctor to testify about specific promises made by Dr. Utlak and/or OHC which induced them to enter into an employment agreement with OHC.

Dr. Maloney, who worked at OHC beginning in 1994 through September 1997, testified about the letter agreement he signed to accept OHC's offer of employment:

"Q. And your agreement was signed in July of 1994?

"A. That's correct.

"Q. Was the following statement made in that agreement quote, 'This means that for example, if you were to become a fourth shareholder of the corporation, you would have 25 percent of the equity ownership of the corporation. Clearly, therefore, your purchase of equity in the corporation has significant value'?

"MR. KANCLER: Objection.

"THE COURT: Overruled.

"BY MR. CONNORS:

"Q. You are to answer yes or no.

"A. Yes, that was in—yes."

Dr. Maloney testified he first saw the closed corporation agreement in November 1996, over two years after working for OHC. Because the closed corporation agreement was at odds with the letter agreement he signed in 1994, and with the promises OHC and Dr. Utlak made to him before he decided to join OHC, Dr. Maloney confronted Dr. Utlak. Dr. Maloney testified Dr. Utlak promised to correct the closed corporation agreement:

"A. It would be more fair, the buy-in would become less and there would be more control for the new members.

"Q. Were any statements made regarding equal ownership?

"A. I don't specifically recall those comments at this point in time. The object was to make it an equal partnership where we would have the opportunity to have an equal investment and a say in how the organization is run as well as equity in benefitting from the success of the practice."

Dr. Sabe, who was employed by OHC for just over two years, also testified about his letter agreement with OHC and the promises which induced him to accept OHC's offer of employment. Dr. Sabe's letter agreement, dated December 6, 1994, contained the same paragraph with regard to equity ownership in OHC:

"This means that, for example, if you were to become the fourth shareholder of the corporation, you would have twenty-five percent of the equity ownership of the corporation. Clearly, therefore, your purchase of equity in the corporation has significant value."

Because the letter agreement also contained a reference to the close corporation agreement, Dr. Sabe requested a copy before signing the contract. Despite his request, Dr. Sabe never received a copy of the agreement. Dr. Sabe testified Mr. Hanlon, the previous CEO of OHC, stated the letter agreement was a summary of the closed corporation agreement. Almost two years later, Dr. Sabe was offered a partnership in OHC. Along with the offer, Dr. Sabe received a copy of the closed corporation agreement.

When Dr. Sabe finally saw the closed corporation agreement "it was a bad night." Instead of receiving the right to purchase an equal share of OHC stock, Dr. Sabe was offered to right to purchase ten shares while Drs. Fabre and Utlak held one hundred fifty shares each.

Dr. Sabe testified he declined OHC's offer because it was unfair, and not the original agreement. Dr. Utlak explained Dr. Sabe would have had an equal share of the revenue, subject to decisions of the executive board. Even though Dr. Sabe was also offered a temporary position on the executive board, without an equal vote in the control of the corporation, an equal share of the revenue would be of little consequence.

Finally, OHC maintains the testimony of Steven Hirsch, M.D. was irrelevant and only served to confuse and mislead the jury. Dr. Hirsch was employed by Stark County Cardiology, Inc. (hereinafter "SCC"), now known as OHC, from July 1, 1990, until July 21, 1992. At that time, the only other physicians in the group were Dr. Utlak and Dr. Fabre.

Dr. Hirsch testified he entered into an employment agreement with Drs. Utlak and Fabre that came in the form of a letter of intent signed by the parties. After two years, if the parties agreed, Dr. Hirsch would have the opportunity to purchase an absolutely equal share of the practice with Drs. Fabre and Utlak.

The trial court did not allow any testimony on the written employment agreement between the parties, and did not admit the letter of intent. However, on direct examination, Dr. Hirsch explained the conversations leading to his acceptance of the employment agreement:

"A. Yes. There was verbal communication to the effect that there would be an opportunity to be absolutely at equal status with Drs. Fabre and Utlak after a certain duration of time [and] a purchase of shares.

"Q. And who made those statements?

"A. Primarily Dr. Utlak; although we did have a supper together with Dr. Fabre. * * *

"Q. And were those statements regarding what equal equity ownership referred to?

"A. Equal equity represented equal status on the governing board of the practice and equal voting rights, equal voting, equal financial remuneration, equal. I felt in every way and I felt their words * * * directly implied that. I mean not just implied but directly stated that.

"Q. Was there any reference to shares?

"A. Yes.

"Q. What was that reference?

"A. That I would have an equal number of, and I would be permitted to buy an equal number of shares; once I had worked for the corporation for two years, that I would be—as long as we continued to mutually agree to continue a working relationship, I would be offered the opportunity over the subsequent four years to buy shares that would at the end of that [period of time] be absolutely equal to the number of shares owned by Dr. Fabre and Dr. Utlak.

"Q. And when was the starting date for you to have that opportunity under your—

"A. July 1, 1992.

" * * *

"Q. When July 1, 1992, approached were you offered continuing employment with Ohio Heart Care?

"A. Yes, I was.

" * * *

"Q. All right. Were you offered equal shares or equal equity ownership in Ohio Heart Care?

" * * *

"[A]: No."

On July 1, 1992, almost exactly two years after Dr. Hirsch started, and at precisely the time of the contemplated partnership, SCC filed a close corporation agreement which "reorganized the corporation." Only at that time, after Dr. Hirsh had dedicated two years of his practice to SCC, did he learn he would not be afforded the opportunity to become a partner:

"A. As of a meeting that I had with Dr. Utlak and James Hanlon[,] who worked for the corporation at that time, I was informed both verbally and on paper that there was no opportunity to buy equal shares in the corporation any longer, that there had been a restructuring of the corporation that had occurred."

OHC maintains the testimony of Drs. Maloney, Sabe, and Hirsch was "patently irrelevant" because their employment agreements were immaterial to the contractual agreement between OHC and Dr. Mkparu. Though their testimony is arguably irrelevant to a breach of contract claim, the claims before the jury at the time of their testimony included fraudulent inducement, punitive damages, and the injunctive relief relating to termination for good cause. We find the testimony was relevant to each of the pending claims.

First, the testimony was relevant to show a pattern of conduct on the part of OHC and Dr. Utlak to induce highly qualified physicians into the practice with false promises of the possibility of equal ownership. We agree the pattern of conduct tended to show OHC and Dr. Utlak knowingly made false representations regarding equal equity ownership to Dr. Mkparu, with the intent to mislead him into entering the employment contract, two of the elements of a fraudulent inducement claim.

We also find the testimony relevant to prove actual malice required for the punitive damage claim. Dr. Hirsch's testimony is particularly damaging in this regard. The fact Dr. Utlak induced a physician into the practice with promises of equal corporate equity after two years, only to reorganize the corporation just before the offer of partnership was to have been extended is certainly relevant to the "gross or egregious" wrongdoing required for punitive damages. This testimony, combined with Dr. Utlak's testimony regarding the formation of UHN shortly before the offer of partnership to Dr. Sabe, is certainly relevant, particularly because Dr. Mkparu was, at that time, only one year away from a potential partnership offer.

Subsequent and analogous alleged misrepresentations to Drs. Sabe and Maloney and ultimately to Dr. Mkparu, when considered together, present relevant evidence on the issue of actual malice. We find a greater inference of actual malice where the same pattern of conduct with regard to representations of equal equity ownership preceded an offer of employment to Dr. Mkparu than if the

conduct had occurred on only one occasion. Repeatedly making the same misrepresentation, knowing it had previously led to the same interpretation by the other doctors, is relevant to the "gross and egregious" conduct required for actual malice.

Having determined the doctors' testimony was relevant to Dr. Mkparu's fraudulent inducement and punitive damage claims, it is unnecessary to discuss its relevance to the injunctive relief claim.

For these reasons, appellant and cross-appellee's first assignment of error is overruled.

## II

In its second assignment of error OHC maintains the trial court erred in admitting evidence regarding the departure of other OHC physicians because the testimony only served to confuse, mislead, and substantially prejudice the jury against appellant. The standard of review, as in assignment of error number one, is abuse of discretion.

OHC's first complains the trial judge failed to instruct the jury to disregard a line of questioning. OHC objected to questions addressing the circumstances under which certain physicians left the practice. The objection was sustained, but the trial court refused to give a requested curative instruction:

"MR. KANCLER: May 1 ask again, Judge, for an instruction to the Jury because this is the second time it happened?

"THE COURT: Well, I'm not going to do that. Don't do it again. I told them once that we're back in here. That only highlights it.

"MR. KANCLER: I understand.

"THE COURT: Let's move on from here and don't go back. Otherwise, I'll do it."

A trial court has wide latitude in conducting examination and cross–examination of a witness. It is clear the trial court thought an instruction to the jury would only serve to highlight objectionable testimony. In fact, counsel for OHC told the judge he understood that point. Though it may have been proper for the trial court to have done so, we find no abuse of discretion in the trial court's decision not to instruct the jury to disregard the line of questioning.

OHC next maintains the trial court erred in allowing Dr. Mkparu to testify about his conversation with Dr. Nahhas. The objection arose in the direct examination of Dr. Mkparu:

"Q. Did [Nahhas] bring up any issues regarding * * * the group?

"A. He brought up issue[s] about physicians leaving.

"Q. And what did he say * * * when he raised that issue?

"A. He told me that—

"MR. KANCLER: Objection.

"THE COURT: Sustained."

"(A conference was held at the bench outside the hearing of the jury.)

"THE COURT: Is he acting as an agent for Ohio Heart or is he really a recruit just walking around?

"MR. CONNORS: This is the real recruit.

"THE COURT: * * * Now tell me how his statement comes in.

"MR. CONNORS: Because they fired him on the basis of Nahhas. They claim that he bad-mouthed to Nahhas.

" * * *

"THE COURT: * * * I'm going to sustain the objection.

"MR. CONNORS: Can I at least characterize why [Dr. Mkparu] gave certain responses?

"THE COURT: I'll let you characterize. * * * *You don't like the characterization, object and I'll make a ruling each time you try, but understand your difficulty.*

"I just think that what he says is central to this case and it is central to the issues being tried."[1] (Emphasis added.)

■ We agree with appellee the statements made during this conversation are central to the issue whether appellee was terminated for just cause. However, the trial court sustained each objection OHC made to "characterizations" about the conversation. Having sustained the objections, appellant is unable to point to any prejudicial testimony emanating from the questions.

Each subsequent attempt by appellee's counsel to characterize Dr. Nahhas's testimony was met with an objection, and each objection was sustained. Further, in light of the fact the deposition transcript of Dr. Nahhas, describing the entire conversation, was read into the record, we see no prejudice which could have

---

1. The record does not specifically identify the basis for the objection, nor the trial court's reason for sustaining the objection. We suspect the basis of the objection was hearsay. Although, at first blush, it would appear to us the trial court found the statements of Dr. Nahhas to be hearsay, because the statements were not being offered to prove the truth of the matter asserted, but rather to provide a context for Dr. Mkparu's responses thereto, we would find no error in the admission of such statements by Dr. Nahhas on the basis of hearsay.

resulted from the allegedly objectionable characterizations. For these reasons, OHC's second assignment of error is overruled.

## III

In its third assignment of error, OHC argues the trial court erred in admitting evidence regarding Medicare and insurance billing fraud. OHC maintains the trial court erred in permitting Dr. Mkparu "to state in a conclusory manner that OHC had misbilled patient services in contravention of established medicare regulations. As a result, the jury heard this highly prejudicial testimony regarding Medicare guidelines and purported violations presented in an authoritative manner by a simple fact witness." We disagree.

Our review of the transcript reveals the complained of error did not occur. Dr. Mkparu used the word "Medicare" only once in his testimony. OHC made no objection at that time. Counsel for OHC made the only other reference to "Medicare" during Dr. Mkparu's testimony and said reference was in a sidebar conversation:

"(A conference was held at the bench outside the hearing of the jury.)

" * * *

"MR. KANCLER: I'm objecting to this exhibit, Your Honor, because—

" * * *

"This memo of the meeting because of the fact the doctor apparently is trying to testify without foundation about billing.

"We went over this in the final pretrial.

"THE COURT: Yeah, I know.

"MR. CONNORS: He's now just stating what was said to him by Ohio Heart Care.

"MR. KANCLER: Without an explanation.

"THE COURT: I think that he can ask him about it—* * *

" * * *

"What are you going to do?

"MR. CONNORS: Ask him to identify it and then I will then ask him what level—

"THE COURT: And where is this going?

"MR. CONNORS: This is just—this goes to the conditions at the time that he was terminated.

"MR. KANCLER: No, it doesn't, Your Honor. That's not true because what they are trying to do by putting in Level 4 is contradicting exactly what you said at the final pretrial. Level 4 is a Medicare billing issue. And we were specifically told were not going to get into.

"MR. CONNORS: No, we weren't.

"THE COURT: Please. I told them, I said that he could ask his client but we weren't going to get into proving or disproving, just what his impression was.

"I'll let you get into this. I'll let you identify it but that's about as far as I'm going to let you get into it. * * *

" * * * *

"(End of conference at the bench.)

"BY MR. CONNORS:

"Q. All right. Drawing your attention now to the last page of Exhibit 15.

"A. 15?

"Q. Yes. Can you identify that document?

"A. Yes, Physician Management Meeting. * * * This memo put out by Dr. David Utlak.

"Q. Did you receive that memo?

"A. Yes.

"Q. And does it state in the third line there—all right, does it state, 'Upon the recommendation of Norm Brooks effective Wednesday, June 19, the Belden Village quote, "docs in the box," end quote—will dictate a short note with every stress test performed in the office. This note will be billed as a level 4 office visit.'

"MR. KANCLER: Object.

"THE COURT: Overruled.

"BY MR. CONNORS:

"Q. Does it state that?

"A. Yes.

"Q. Why did this raise an issue in your mind?

"A. This was an issue of ethics, an issue of what is right and wrong. Patients are referred to us, vulnerable people. Trust us to do the right thing, and here our manager physician was telling us to cheat our patients and bill for services that they didn't need.

"Q. How?

"MR. KANCLER: Your Honor, I move to strike that. That is opinion.

"THE COURT: I'm going to sustain the objection and the phrase 'cheat,' and I'm going to instruct the Jury to disregard that, and Mr. Connors, and Doctor, if you're giving your opinion, I'm going to caution you on the words that you use, and the word, 'cheat' is unacceptable in my courtroom and you shall not use it again.

"Do you understand me, sir?

"THE WITNESS: Yes, Your Honor.

"THE COURT: Ladies and Gentlemen of the Jury, you are instructed to disregard that. You have an opinion. You may state it.

"THE WITNESS: Okay.

"THE COURT: But you will not state it in those terms. Do you understand that, Mr. Connors?

"MR. CONNORS: Yes, Your Honor.

"THE WITNESS: Sorry, Your Honor.

"Q. With that understanding, can you explain why this was a problem?

"A. Not every patient that is referred for a stress test needs to be billed for an office Level 4.

"Q. When you say not every patient should be billed at Level 4, what do you mean by that?

"A. To add office visit for stress test. Most of these patients have their own physicians already. They are referred by their own physician and they have already had office visits with their physicians. For them to refer the patient to us and for us to turn around and bill also for the office visit, that was where I had some problem.

"Q. Why?

"A. Because they didn't need it most of the time."

The testimony continued:

"Q. No, I just meant what was the issue?

"A. There are a couple of issues. One issue that some of the non-physician services were being billed as physician services.

"Q. And what was the example from which that occurred?

"MR. KANCLER: Your Honor.

"THE COURT: Just let me stop you for a minute.

"(A conference was held at the bench outside the hearing of the jury.)

"MR. KANCLER: There is no foundation being laid for what this doctor is starting to testify about, and that is his knowledge of Medicare regulations as to billing practices and how he's going to be allowed to testify as to what he thinks, and I don't think that's fair.

"MR. CONNORS: Well, I thought we went over this. I can lay a foundation. That's not the problem but we did discuss this. You indicated that this line of questioning would be permitted when you raised it in meetings before the trial.

"MR. KANCLER: As to his feelings of dissatisfaction but not as to his knowledge, but what you're going on is you're going on a route that is going to have him back door it into being qualified as some kind of Medicare expert which he's not.

"MR. CONNORS: These don't require expertise, I mean these are simple statements of what services can be billed. That's a red herring.

"THE COURT: Let me ask you this: What relevancy does this have to being fraudulently induced to enter into contract?

"MR. CONNORS: This goes—

"THE COURT: This—

"MR. CONNORS: He gave a bad recommendation regarding Ohio Heart Care this phony recruit and he had a reason for it.

"THE COURT: So some of you're here is your claim and some of what you're doing is to answer their claim because your claim is fraudulent.

"MR. CONNORS: Yes and no for the declaratory judgment. What's detrimental we can break it up but [it becomes] awkward.

"MR. CONNORS: Sure, but I mean the whole gist of what or one of the central issues is why did this guy give a bad recommendation? It didn't come out of thin air. There is a lot of things. * * *

" * * * *

"THE COURT: I'm going to let you lead him through this a little bit. That may be one, * * * way to resolve. * * * Be careful of what you lead.

"MR. CONNORS: All right.

"(End of conference at the bench.)

"BY MR. CONNORS:

"Q. All right. Doctor, you indicated that your belief that non-physician services would be billed as physician services. Was lipid clinic visits one of the examples of such a circumstance?

"A. Yes.

"Q. Did that also occur with cardiac rehabilitation services?

"A. Yes.

"Q. And with regard to the heart failure clinic did that also occur?

"A. Yes.

"Q. And of course, you were familiar with the heart, intimately with the heart failure clinic, is that correct?

"A. Yes.

"Q. Were there also problems with billing of physician office visits?

"MR. KANCLER: Your Honor, I must approach again.

"THE COURT: Overruled. * * * Go ahead. You may answer.

"THE WITNESS: Yes.

"THE COURT: Well, let's rephrase the question. Your question is were there problems. Let's ensure that this is in his opinion.

"MR. CONNORS: In your view.

"THE COURT: That he had disagreement of the method of which—let's rephrase the question.

"BY MR. CONNORS:

"Q. In your view were there problems with billing of office—physician office visits?

"A. Yes.

"Q. And was it your view that they were being billed at levels higher than were permitted under appropriate practice?

"MR. KANCLER: Objection.

"THE COURT: Overruled.

"THE WITNESS: Yes.

"BY MR. CONNORS:

Q. And did this occur with regard to the stress tests relating to the memo that we saw earlier?

A. Yes.

"Q. Doctor, regarding your knowledge of billing what responsibility does a treating physician have regarding the billing procedure?

"A. The physician who sees the patient or who the services are billed under is liable for any misbilling under the Medicare rules.

"Q. And how is a doctor to know how to bill a service? Is there a book that helps doctors determine what service to bill?

"A. Yes."

When taken in context, we do not believe the trial court abused its discretion in admitting Dr. Mkparu's testimony concerning OHC's billing practices. Notably absent is any objection to Dr. Mkparu's one reference to "Medicare." Finally, we note OHC's trial objection was based on lack of foundation. We find no abuse of discretion in the trial court's admission of this testimony over an objection for lack of foundation. OHC's failure to specifically object on the grounds it now asserts on appeal (undue prejudice), has not been properly preserved for our review because it was not specifically argued as the basis for its objection in the trial court.

Appellant's third assignment of error is overruled.

## CROSS–APPEAL

### I

In his first assignment of error on cross-appeal, Dr. Mkparu maintains the trial court erred in granting Dr. Utlak's motion for a directed verdict on his fraudulent inducement claim and punitive damage claim because the claims were supported by substantial competent evidence. We shall address the punitive damage claim in our discussion of Cross–Appeal II.

The standard of review for the grant or denial of a motion for directed verdict is whether there is probative evidence which, if believed, would permit reasonable minds to come to different conclusions as to the essential elements of the case, construing the evidence most strongly in favor of the non-movant. *Sanek v. Duracote Corp.* (1989), 43 Ohio St.3d 169, 172, 539 N.E.2d 1114, 1116–1117; Civ.R. 50(A)(4).

Ohio law recognizes corporate officers may be liable in their individual capacity for acts of fraud. *Heritage Funding & Leasing Co. v. Phee* (1997), 120 Ohio App.3d 422, 430, 698 N.E.2d 67, 72–73. "To fasten personal liability upon a corporate officer for fraud, it must be shown that he knew the statement was false, that he intended it to be acted upon by the parties seeking redress, and that it was acted upon to the injury of the part[ies]." *Centennial Ins. Co. of New York v. Vic Tanny Internatl. of Toledo, Inc.* (1975), 46 Ohio App.2d 137, 141, 346 N.E.2d 330, 334. " 'Directors and corporate officers generally may be personally liable for fraud even though the corporation may be liable also. * * *' * * * 'A tort victim is entitled to recover from the agent as well as the principal for

fraudulent misstatements made by the agent in the course of his employment.' * * *" *Heritage Funding,* 120 Ohio App.3d at 430–431, 698 N.E.2d at 73.

OHC and Dr. Utlak moved for a directed verdict at the close of Dr. Mkparu's case in chief:

"THE COURT: The Court is going to grant your motion in part on this ruling. The Court is going to grant a directed verdict as to Dr. Utlak individually.

"There has been absolutely no testimony that the Court finds to be sufficient to expose Dr. Utlak to personal liability on the claims and his being named individually, I will grant a directed verdict in favor of Dr. Utlak.

"I will, however, deny the motion for directed verdict against Ohio Heart Care.

"I believe that there is sufficient—there is at least evidence sufficient to defeat a directed verdict request as to what was represented to him.

"And this issue I think is sufficient to go to the Jury on Ohio Heart Care as a limited partnership or limited whatever they call it, liability corporation. So sustained and overruled for those reasons."

When viewing the evidence most strongly in favor of the non-movant, we find the trial court erred in granting a directed verdict in favor of Dr. Utlak. In Dr. Mkparu's case-in-chief, Dr. Utlak testified his statements to Dr. Mkparu were intended to persuade Dr. Mkparu to accept employment with OHC. Dr. Utlak was aware of the closed corporation agreement at the time he sent the letter agreement to Dr. Mkparu and still made the statements regarding equal equity upon partnership. The testimony of Drs. Maloney, Sabe, and Hirsch, when taken in a light most favorable to appellee, indicates Dr. Utlak knew the statements with regard to equal equity were false.

The fact this same evidence was ultimately deemed credible and sufficient by the jury to support its verdict against OHC for fraudulent inducement supports our conclusion the trial court erred in granting a directed verdict on the fraudulent inducement claims against Dr. Utlak individually.

Accordingly, the first assignment of error on the cross-appeal is sustained.

CROSS–APPEAL

II

In his second assignment of error on cross-appeal, Dr. Mkparu maintains the trial court erred in granting OHC's motion for a directed verdict at the close of all evidence on his claim for punitive damages against OHC. Because the issues are interrelated, we also address the trial court's grant of a directed

verdict at the close of Dr. Mkparu's case-in-chief on the punitive damage claim against Dr. Utlak individually.

At the close of all evidence, counsel for OHC moved for a directed verdict as to all claims against OHC. The trial court overruled the motion on the fraudulent inducement claim, but requested argument on the punitive damage claim:

"THE COURT: * * * Issue of punitive damages.

"MR. KANCLER: Your Honor, we object to the proposed charge in its entirety on punitive damages for two very simple reasons.

"One, is that the record in this case, whichever way anybody looks at it, does not constitute the type that involves punitive damages.

"There is no evidence of actual malice or inferred malice of this record.

"The second reason is simple likewise. To charge on punitive damages based on the record in this case, we believe, would be highly prejudicial to Ohio Heart Care. I don't think there is a single witness here, there is a single fact here, there is a single document here that evidences the kind of conduct that would warrant a punitive damage charge.

"THE COURT: Thank you, Mr. Kancler. Mr. Connors.

"MR. CONNORS: The question before the Court is whether there is enough evidence that a reasonable person could believe that there was conscious disregard of the rights of others. That's the test. If there is any evidence from which a juror could conclude that, then the issue should go to the Jury.

"When talking about the type of conduct, there is a very specific test. Was there a conscious disregard for the rights of Dr. Mkparu? And we have circumstantial evidence that the term, 'equity' clearly refers to stock and that it was used in such a way as to mislead Dr. Mkparu.

"We have the admission of Jeff Russell that equity refers to stock. We have Dr. Hirsch stating that the term, 'equal equity ownership' is used by Dr. Utlak in reference to an offer of one-third of the stock. We have the problems experienced by Drs. Maloney and Sabe.

"There is a long course of conduct here. This is not an innocent error. There clearly is some evidence from which a reasonable Jury could conclude that there was conscious disregard for the rights of Dr. Mkparu.

"THE COURT: The allegation of Dr. Mkparu against Ohio Heart Care is based on a contract, and the evidence, as indicated, or the evidence, as shown to the Court, that the phrase, equity partnership and the phrase and the allegation of, which I think is based, is the main thrust of the misrepresentation, but also

taking into consideration the donation into the, into the pension fund is all based on a contract that is printed, the printed word.

"And that contract then refers to the Close Corporation Agreement which further explains the phrase that is in controversy here today.

"In order to find that punitive damages should go to the [the jury], the Court has to find that there is credible evidence that there is malice involved.

"The Court has not heard evidence outside of the contractual language * * * which it considers to be any credible evidence that any statements were made by any agent of Ohio Heart Care to substantiate a claim of actual malice.

"Dr. Mkparu's claim in my opinion is a technical claim on interpretation of a contract, and he's made a claim and he has stated in his words that he feels that he was misrepresented and they were fraudulent in that misrepresentation. And if he believes that, then he has a right to prove that to a Jury.

"However, the issue of whether or not punitive damages is appropriate is a decision that is within this Court's discretion.

"The Court finds that the definitions, and I'll read them into the record, of actual malice is that there is a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.

"Substantial means major, real importance or of great significance and not trifling or small.

"I would have to—just has to be evidence to show by clear and convincing that the Defendants' acts or failure to act demonstrate malice or aggravated or a gregarious [sic] fraud and that Dr. Mkparu has presented proof of actual damages that resulted.

"The Court finds there is insufficient evidence to permit the Jury to consider punitive damages, and the Court hereby strikes the punitive request as requested by counsel for Ohio Heart Care."

Based upon the testimony of Dr. Mkparu, Dr. Utlak, Dr. Maloney, Dr. Sabe, and Dr. Hirsh as discussed, *supra*, when construing the evidence most strongly in favor of the non-moving party, we conclude reasonable minds could conclude OHC, through its agent and principal, Dr. Utlak, acted with actual malice in inducing Dr. Mkparu to enter into an employment contract. Accordingly, we find the trial court erred in dismissing the claim for punitive damages against OHC. Based upon this same evidence and standard of review, and for the same reasons we found Dr. Utlak could be individually liable on the claim for fraudulent inducement as discussed in Cross–Assignment of Error I, *supra*, we find reasonable minds could conclude Dr. Utlak acted with malice. The trial court

also erred in dismissing Dr. Mkparu's claim for punitive damages against Dr. Utlak individually.

Appellant's second cross–assignment of error is sustained.

The judgement of the Stark County Court of Common Pleas is affirmed in part and reversed in part. The matter is remanded to the trial court for further proceedings consistent with our opinion and law.

*Judgment accordingly.*

WISE, P.J., and READER, J., concur.

W. DON READER, J., retired, of the Fifth Appellate District, sitting by assignment.